David Lindsey
7887 E. Belleview Ave. Ste. 1100
Englewood CO 80111
Phone Number: (303) 228-2270
Fax Number: (303) 228-2271
Email: david@mdavidlindsey.com

David A. Lane
Darold W. Killmer
Qusair Mohamedbhai
**KILLMER, LANE & NEWMAN, L.L.P.**
1543 Champa Street, Suite 400
The Odd Fellows' Hall
Denver, CO 80202
Phone Number: (303) 571-1000
Fax Number: (303) 571-1001

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| Plaintiff(s), ) | |
| ) | |
| WILLIAM AYERS ) | |
| MEGHAN LANKER ) | Case No. 10-cv-79-D |
| ) | |
| vs. ) | |
| ) | |
| Defendant(s) ) | |
| ) | |
| UNIVERSITY OF WYOMING ) | |
| TOM BUCHANAN, in his official capacity ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs William Ayers and Meghan Lanker, by their attorneys David A. Lane, Darold W. Killmer, and Qusair Mohamedbhai of the law firm of KILLMER, LANE & NEWMAN, LLP, and David Lindsay hereby submit this Reply in Support of their Motion for Preliminary Injunction.

## I.   REPLY

**A.   The Tenth Circuit Court of Appeals has Unequivocally Stated that the Government may not Restrict Speech due to of Threats of Violence**

In their Response, Defendants have attached affidavits from members of the public and University of Wyoming officials describing various levels of threatening communications from a few members of the public in response to Professor Ayers' planned speeches.  Even if the Court were to take the affidavits as completely true, the Tenth Circuit Court of Appeals has pronounced that these third-party threats of violence are no basis for the governmental restriction on protected speech.

**1.   Defendants Fail to Address the Tenth Circuit's Rejection of "the Heckler's Veto"**

The Tenth Circuit Court of Appeals has specifically rejected the notion that speech may be curtailed "in order to prevent public disorder." *Flanagan v. Munger*, 890 F.2d 1557, 1567 (10th Cir. 1989). "Apprehension of disturbance is not enough to overcome the right to freedom of expression." *Flanagan v. Munger*, 890 F.2d 1557, 1567 (10th Cir. 1989) (citations omitted)(Tenth Circuit Court of Appeals noting that "[t]he Supreme Court's rejection of the heckler's veto lends support…" that the "defendants have only an attenuated interest in preventing plaintiffs' speech")(emphasis added)).

While a college has a legitimate interest in preventing disruption on the campus, which under certain circumstances may justify such limited restraint, a "heavy burden" rests on the college to demonstrate the appropriateness of that action.  *See Near v. Minnesota*, 283 U.S. 697, 713-716 (1931); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418 (1971); *Freedman v. Maryland*, 380 U.S. 51, 57 (1965).   Moreover, the Supreme Court has recognized a significant governmental interest in preventing expressive activity that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *PeTA v. Rasmussen*, 298 F.3d 1198, 1204 (10th Cir. Utah 2002) citing *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)(emphasis added).  Implicitly, however, governmental restrictions on free speech may only occur if it is the <u>expressive activity</u> that causes the disruption and disorder (not the conduct of third-parties in response to or in anticipation of that expressive activity). *See, id.*

In this case, it is undisputed that Professor Ayers' speech itself will not cause disruption or disorder.  All alleged disruption will be done by third-parties entirely unrelated to the Professor Ayers and those organizing the speech.  As such, the government may not regulate speech because of the threatened criminal acts of others.

**2.**     ***Skokie v. National Socialist Party* <u>Precisely Rejects Defendants' Argument that the Possibility of Violence by the Audience is a Permissive Justification to Curtail First Amendment Protected Conduct</u>**

In the case of *Skokie v. National Socialist Party*, 69 Ill. 2d 605 (Ill. 1978) "[p]laintiff, village of Skokie, filed a complaint in the circuit court of Cook County on April 28, 1977, praying for the issuance of an injunction prohibiting defendants, the National Socialist Party of

America and certain individual officers and members of the Party, from engaging in various activities in the village." *Skokie v. National Socialist Party*, 51 Ill. App. 3d 279, 281 (Ill. App. Ct. 1977). "After a hearing on the matter, the injunction was entered." *Id.*

"The village of Skokie contains a population of approximately 70,000 persons, of whom approximately 40,500 are of the Jewish religion, Jewish ancestry, or both. Included within the Jewish population are hundreds of persons who are survivors of Nazi concentration camps and many thousands whose families and close relatives were murdered by the Nazis." *Skokie v. National Socialist Party*, 51 Ill. App. 3d at 282.

The injunction prohibited the Nazis from performing any of the following actions within the village of Skokie: "[m]arching, walking or parading in the uniform of the National Socialist Party of America; [m]arching, walking or parading or otherwise displaying the swastika on or off their person; [d]istributing pamphlets or displaying any materials which incite or promote hatred against persons of Jewish faith or ancestry or hatred against persons of any faith or ancestry, race or religion." *National Socialist Party v. Skokie,* 432 U.S. 43 (1977).

After remand from the United States Supreme Court, which required Illinois to grant the Nazis an appellate forum from the trail court's decision granting government's injunction, the Illinois Court of Appeals overturned the trial court's injunction in part and found that "[t]he law of our nation is clear as to the question of whether the presence of hostile spectators or bystanders may justify the restraint of otherwise legal first amendment activities." *Skokie,* 51 Ill. App. 3d at 287.

> As to the possibility of there being hostile audience members causing violence, the law is quite clear that such considerations are impermissible." (*Collin v. Chicago Park District* (7th Cir. 1972), 460 F.2d 746, 754.) Starting with *Terminiello v. City of Chicago* (1948), 337 U.S. 1, 93 L. Ed. 1131, 69 S. Ct. 894, and continuing through *Gregory v. City of Chicago* (1969), 394 U.S. 111, 22 L. Ed. 2d 134, 89 S. Ct. 946, the rule has been that if the communications expressed do not fit into an exception stripping them of first amendment protections, then under our Constitution, the public expression of ideas may not be prohibited merely because the ideas themselves are offensive to the hearers.  "The threat of a hostile audience cannot be considered in determining whether a permit shall be granted or in ruling on a request for an injunction against a demonstration. * * * Thus, our laws bespeak what should be; for were it otherwise, enjoyment of constitutional rights by the peaceable and law-abiding would depend on the dictates of those willing  to resort to violence." (*Dr. Martin Luther King, Jr. Movement, Inc. v. City of Chicago* (N.D. Ill. 1976), 419 F. Supp. 667, 675; see *Rockwell v. Morris* (1961), 12 App. Div. 2d 272, 211 N.Y.S.2d 25.)

*Skokie,* 51 Ill. App. 3d at 287.

The Illinois Court of Appeals did authorize certain expressive activity: "[Defendants] be and hereby are enjoined and restrained from engaging in any of the following actions within the village of Skokie until further order of the court: Intentionally displaying the swastika on or off their persons, in the course of a demonstration, march, or parade." *Skokie v. National Socialist Party*, 51 Ill. App. 3d at 295.

The Supreme Court of Illinois reversed this restriction authorized by the Illinois Court of Appeals, permitting the march of the Nazis through the Jewish village of Skokie without any restraint whatsoever, and concluded that "the display of the swastika cannot be enjoined under the fighting-words exception to free speech, nor can anticipation of a hostile audience justify the prior restraint." *Skokie v. National Socialist Party*, 69 Ill. 2d 605, 619 (Ill. 1978).  The threat of violence in the situation of Nazis marching through a Jewish village is obviously and incomparably greater than this case. The *Skokie v. National Socialist Party* cases underscores

well-settled law that the possibility of criminal acts of perpetrated by third-parties is not a legal justification to curtail First Amendment protected conduct.

3.     **Defendants Incorrectly Rely on *Healy v. James* in Support of their Arguments**

In their Response, Defendants cite the United States Supreme Court case *Healy v. James*, 408 U.S. 169 (1972), arguing that this case "acknowledged need for order on campus; suggesting that a college may have a legitimate interest in preventing disruption on the campus, which, under circumstances requiring the safeguarding of that interest, may justify speech restriction." *Defendants' Response,* pg. 5.  *Healy* does not stand for this breathtakingly broad proposition.

In *Healy*, during 1969-1970, a "climate of unrest prevailed on many college campuses in this country."  *Healy*, 408 U.S. at 171.  "There had been widespread civil disobedience on some campuses, accompanied by the seizure of buildings, vandalism, and arson." *Id.*  "Some colleges had been shut down altogether, while at others files were looted and manuscripts destroyed." *Id.* "Student for a Democratic Society ("SDS") chapters on some of those campuses had been a catalytic force during this period." *Id.*

The petitioners in *Healy* were "students attending Central Connecticut State College ("CCSC"), a state-supported institution of higher learning." *Id. at 172.*  "In September 1969 they undertook to organize what they then referred to as a 'local chapter' of SDS." *Id.* However, the President of CCSC denied petitioners' attempt to form a local chapter of SDS. *Id.* at 176.  Among other reasons, the President rejected the formation of the SDS because "disruption and violence, are contrary to the approved policy (by faculty, students, and administration) of Central Connecticut State College." *Healy*, 408 U.S. at 176, n.4.

The Supreme Court in *Healy* reaffirmed the importance of the use of campus facilities for meetings and other appropriate purposes, as inherently part of First Amendment protections for freedom of association. *Healy,* 408 U.S. at 181. The Supreme Court further stated:

> Where state-operated educational institutions are involved, this Court has long recognized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. **Yet, the precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large.**

*Healy*, 408 U.S. at 180 (emphasis added). "Because respondents failed to accord due recognition to First Amendment principles, the judgments below approving respondents' denial of recognition must be reversed." *Healy*, 408 U.S. 169, 194 (U.S. 1972). In this regard, the Supreme Court in *Healy* rejected the campus President's fears of violence on campus as a legitimate justification to curtail First Amendment protected conduct. *See, id.* Defendants' reliance on *Healy* is misplaced, as *Healy* supports this Court's rejection of Defendants' argument that Plaintiffs' First Amendment protected rights may be abridged due to fear of violence.

**B.     The Possibility that Professor Ayers' Speech Could Happen at Another Location is not a Justification to Preclude the Speech at the Sports Complex**

Defendants argue that "[i]n this instance, Plaintiffs are simply denied the opportunity to rent the Sports Complex" and Plaintiffs have "have ample alternative channels for communication of their desired message." *Response,* pg. 9. Specifically, Defendants argue that "[n]othing prohibits Plaintiffs from distributing written copies of Ayers' speech, renting another

government facility, or even speaking in a public forum such as Prexy's Pasture, an open area in the middle of the University campus."

Defendants' argument has been rejected by this Court. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Westbrook v. Teton County Sch. Dist. No. 1*, 918 F. Supp. 1475, 1496 (D. Wyo. 1996) (Brimmer, J.) citing *Schneider v. State*, 308 U.S. 147, 163 (1939). Additionally, Defendants' argument is factually inconsistent to the position of the University of Wyoming in this case. Susan Weidel, General Counsel, informed Ms. Lanker in writing that Professor Ayers was not permitted to give his speech anywhere on campus. Certainly, the University of Wyoming, up until the filing of Defendants' Response, has never suggested that Professor Ayers is permitted to give his speech in other locations at the University of Wyoming. Moreover, if the University of Wyoming was truly concerned with student and faculty safety, they would not so readily concede that Professor Ayers may give his speech in the middle of Prexy's Pasture (arguably the least secure location on the entire campus).

## II. CONCLUSION

This Court has been protective of First Amendment speech in Wyoming's schools. In *Westbrook v. Teton County Sch. Dist. No. 1*, 918 F. Supp. 1475, 1491 (D. Wyo. 1996), Judge Brimmer of this Court stated the following:

> …it is not hard to agree with the general proposition that speech should be particularly free in the schools. As an ideal toward which this society aspires, schools are places where students learn not only reading, writing, and arithmetic, but also learn how to think critically. Indeed, some would argue that the ability to think critically -- here, the Court uses the word "critically" in its broadest sense (i.e., "the art of evaluating or

analyzing") -- underlies the ability to read, write, and factor. Just as critical thought is essential to reading, writing, and factoring, it is equally true that free speech is essential to critical thought. Knowing this, the Supreme Court often has stated that schools in particular should provide sanctuary for free speech. Many of these statements -- all of which are dicta -- also appear to spring from the Court's recurring frustration with a corollary to Lord Acton's axiom: those with power tend to suppress speech.

In permanently enjoining Teton County from enforcing an unconstitutional policy, Judge Brimmer stated "it would be well if those entrusted to administer the teaching of American history and government began their efforts by practicing the document on which that history and government are based." *Westbrook v. Teton County Sch. Dist. No. 1*, 918 F. Supp. at 1491 (citation omitted).

Judge Brimmer in the *Westbrook* opinion further stated:

Those who won our independence believed that the final end of the State was to make men free to develop their faculties; and that in its government the deliberative forces should prevail over the arbitrary…They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth;…that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government…**Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.**

*Westbrook v. Teton County Sch. Dist. No. 1*, 918 F. Supp. at 1491 (emphasis added).

This case presents an example of unequivocal suppression of unpopular speech due to "tyranny of the majority," or "tyranny of those willing to threaten violence," or a "tyranny of a few major donors"). Republican candidate for Wyoming Governor Ron Micheli letter sent to all members of the University of Wyoming Board Of Trustees, days before the cancellation of Mr. Ayers' first speech, which precisely underscores the importance of the First Amendment. In this letter, among other things, Mr. Micheli states the following: "I really believe that if this event is

allowed to take place and the University of Wyoming plays unapologetic host to this terrorist, the reputation of this great institution among the citizenry of this state will suffer greatly for many years to come – perhaps permanently. It would be unwise for the leaders of the University of Wyoming to turn a **deaf ear to the outrage of the people over this invitation**." (emphasis added).

As Judge Brimmer stated in the *Westbrook* decision, the First Amendment is designed to protect against the tyranny of the majority. Contrary to Mr. Micheli's position, the First Amendment requires turning a deaf ear to the howling mob of the majority when it seeks to suppress unpopular speech.

WHEREFORE, Plaintiffs respectfully request this Court grant its Motion and enjoin Defendants from preventing Mr. Ayers' speech scheduled for April 28, 2010.

Dated this 25th day of April 2010.

        KILLMER, LANE & NEWMAN, LLP

        s/ Qusair Mohamedbhai

        **DAVID A. LANE**
        **DAROLD W. KILLMER**
        **QUSAIR MOHAMEDBHAI**
        1543 Champa Street, Suite 400
        Denver, CO  80202
        (303) 571-1000
        dlane@kln-law.com
        dkillmer@kln-law.com
        qmohamedbhai@kln-law.com

        ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of April, 2010, a true and correct copy of the foregoing REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION, was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Tom Rice, Esq.
Counsel for UW
trice@sgrllc.com

                                                             s/ Qusair Mohamedbhai